**In the Matter of Charles A. DAVIS, Jr.**

No. 20S00–9904–DI–238.

Supreme Court of Indiana.

Jan. 10, 2001.

James F. Groves, South Bend, IN, for the Respondent.

Donald R. Lundberg, Executive Secretary, Seth Pruden, Staff Attorney, India-

napolis, IN, for the Indiana Supreme Court Disciplinary Commission.

## DISCIPLINARY ACTION

### PER CURIAM

The respondent, Charles A. Davis, Jr., improperly partnered with his client in a variety of business dealings funded primarily by an earlier $200,000 personal injury settlement he negotiated on the client's behalf. The business ventures ultimately proved unsuccessful, as did the partnership between the respondent and his injured client. The client lost much of her settlement money. We suspend the respondent from the practice of law for 18 months as a result of his misconduct.

Having been admitted to the bar of this state in 1978, the respondent is subject to this Court's disciplinary jurisdiction. The Disciplinary Commission charged the respondent with violating Rule 1.8(a) of the *Rules of Professional Conduct* by entering into several business transactions with his client, who was not given the opportunity to seek the advice of independent legal counsel. The Commission also charged the respondent with violating Prof.Cond.R. 1.15(a) by failing to keep his own funds separate from his client's funds and Prof. Cond.R. 1.15(b) by failing to deliver promptly to his client the funds she was entitled to receive from the settlement.[1]

A hearing officer was appointed to this case, and, after a hearing, tendered his report to this Court. The hearing officer determined the respondent committed the charged misconduct. Neither the respondent nor the Commission has sought review of the hearing officer's report, but both have submitted briefs on the question of sanction. Where, as here, the hearing officer's report is unchallenged, we accept and adopt the findings contained therein with the understanding that final determination as to disciplinary violations and sanction rests with this Court. *Matter of Campbell,* 702 N.E.2d 692 (Ind.1998).

Accordingly, we now find that the respondent represented the client regarding a claim for injuries the client sustained in an automobile accident. She was disabled as a result of the accident and could not return to the factory position she held before the accident. Their fee agreement provided that the respondent would receive 33–1/3% of any amounts recovered. The respondent negotiated for his client a $200,000 settlement with the insurer.

After that settlement was reached but before the check was issued, the respondent opened a personal bank account. The respondent, who referred to the account as a "conduit account", claimed he intended to use the account to pay certain costs and expenses of the client, while keeping the bulk of her funds in another account. At

---

1. Prof.Cond.R. 1.8(a) provides:
   A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:
   (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;
   (2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
   (3) the client consents in writing thereto.
   Prof.Cond.R. 1.15 provides:
   (a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account....
   (b) Upon receiving funds or other property in which the client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

the time of the settlement and hearing of this matter, the respondent did not have a designated trust account as required by the *Rules of Professional Conduct.*

The initial deposit in that personal account was forty-five dollars ($45.00). However, on June 14, 1991, the respondent deposited $9,000 into the account. The respondent claimed at the hearing that he personally borrowed the $9,000 to make an advance of the settlement to the client to pay her living expenses or other obligations, in anticipation of settlement. By the time the insurer issued the settlement check on June 22, 1991, all but forty-five dollars ($45.00) in the personal account had been spent.

The $200,000 settlement check was payable to the client and to the respondent as her attorney. Three days after the check's issuance, the respondent and the client went to the bank where he had opened the personal account. The respondent opened a second account, in his name and that of his client. He deposited $150,000 of the settlement proceeds into the joint account and deposited the remaining $50,000 into the personal account. The respondent did not designate which portions of the deposits in the joint account belonged to the client and which belonged to him. Under the terms of the fee agreement, the respondent was entitled to one-third of the settlement proceeds or $66,666.66. The client was entitled to the remainder, less expenses.

The respondent testified that the client requested, and he agreed, that he hold the settlement money on the client's behalf because the client had a drinking and drug problem and had a difficult time with money. The respondent further testified that he believed their attorney/client relationship ended when the settlement was received and that from that time forward, he served only as her friend, advisor and business partner.

After depositing the settlement proceeds into the two accounts, the respondent issued a check to the client from the personal account for $3,000. One day later, he wrote a check payable from the personal account for $9,031.50 to the bank to pay off the $9,000 loan he had made to the client to provide for her living expenses.

Between June 27 and July 1, 1991, the respondent wrote checks on the personal account totaling $26,506.50, of which $12,031.50 was for the client and the remainder was to pay his personal expenses. On July 2, 1991, the respondent transferred $30,000 from the joint account into the personal account and used part of that money to pay his client's medical expenses and part to pay more of his personal expenses.

The respondent advised the client that investing in Coca–Cola antiques or collectibles would be a sound investment opportunity for her. On the basis of that representation, the client agreed to enter into an equal partnership with the respondent to buy and sell such items for profit. On July 9, 1991, the respondent made two separate wire transfers of funds from the joint account, each in the amount of $20,010, to a collectibles dealer to purchase Coca–Cola art. One of the $20,010 payments was from the respondent's share of the settlement funds, and the other payment was from the client's recovery. On July 16, 1991, the respondent wired another $16,010 to the dealer for additional Coca–Cola art. As of that date, the total remaining to the respondent of his $66,666.66 fee was $8,976.66.

The respondent discussed with the client her purchase or creation of a business to provide her with a steady income, inasmuch as her injuries necessitated a career change. The respondent and the client purchased a "rent to own" furniture and appliance business. Although the respondent testified that he was never a partner in the business, the evidence establishes that he, in fact, was an equal partner with the client.

The respondent wrote checks totaling $14,000 from the personal account to the

owner of the rent-to-own business in July 1991. All of that money belonged to the client. The respondent also hired an attorney to prepare papers establishing the new enterprise, for which both the respondent and the client served as directors. The respondent, as president of the company, obtained a $15,000 line of credit from a bank and executed a personal continuing guaranty for that loan. The 1991 tax returns for the business showed an ordinary loss of $9,224.

The respondent continued to pay his personal expenses from the settlement proceeds. He also spent $31,000 of the client's portion to buy a commercial building which the respondent and the client held as tenants in common. On August 6, 1991, just six weeks after the settlement check arrived, the respondent transferred the $22,484 .60 remaining in the joint account into the personal account. He wrote a check for $20,446.74 to the client, leaving only $1,795.32 of the original $200,000.

The respondent and the client bought a house on contract for the client, who could not obtain financing on her own because of a previous bankruptcy. Although the house was later sold for a profit which the client retained, attempts to sell the Coca–Cola art for a profit were largely unsuccessful. The other business ventures—the rent-to-own business and the commercial building—also did not produce profit. By May 1992, the client was out of funds. The respondent, who also needed funds, suggested that the client transfer property to him and that he would use that property as collateral for a loan which both of them could use.

The client transferred ownership of a rental home to the respondent by quit-claim deed. The respondent told the client he would borrow $6,900 from the bank, pay half to the client and then pay her the remainder in the future. He executed a promissory note to the client in the amount of $6,900. Instead, the respondent borrowed $11,970.58 against the property—nearly twice what he agreed to pay the client—and never informed the client of the discrepancy. He paid the client $3,500 of the $11,970.58 and kept the remainder.

The client, disenchanted with her failed business relationship with the respondent, sought help from a financial planner, who negotiated a settlement with the respondent. The respondent in early 1993 executed a promissory note to the client in the amount of $35,750 in return for her interests in the commercial building, the rent-to-own business, and any Coca–Cola items still in her possession. The respondent and the client disagreed at the hearing as to whether the promissory note had been paid in full, but the hearing officer found that the transfer of the commercial property to the client was evidence that the respondent had paid the note.

■ We find that the respondent violated Ind.Prof.Cond.R. 1.15(a) by failing to keep his client's funds separate from his own. His funds and her funds were intermingled in the personal and joint accounts until all of the money was spent. He paid both his client's expenses and his personal and business expenses from those accounts and failed to closely track the funds.

■ We further find that the respondent violated Ind.Prof.Cond.R. 1.8(a), which prohibits attorneys from entering into business transactions with their clients or knowingly acquiring interests adverse to clients absent full disclosure, a reasonable opportunity for the clients to seek advice of independent counsel, and the clients' consent. Immediately after concluding his representation of the client in her personal injury claim and while he continued to serve as her attorney in other matters, the respondent became her partner, her business advisor, and, to some extent, her banker. He did not advise her to seek independent counsel before entering into those relationships nor did he disclose how his interests as a business partner would be adverse to hers.

■ We further find that by depositing the funds into accounts which he controlled instead of delivering the client's share of the settlement to her, the respondent failed to deliver promptly the client's funds to her in violation of Prof.Cond.R. 1.15(b).

■ We must now determine an appropriate sanction. In doing so, we consider the misconduct, the respondent's state of mind underlying the misconduct, the duty of this court to preserve the integrity of the profession, the risk to the public in allowing the respondent to continue in practice, and any mitigating or aggravating factors. *Matter of Mears,* 723 N.E.2d 873 (Ind.2000).

In briefs before this ·Court, the respondent argues he had no intent to defraud or harm his client and, in fact, partnered with her only to assist her financially. The Commission contends the respondent ignored the usual safeguards of a fiduciary relationship and took advantage of an unsophisticated client, exposing her money to high risk investments while insuring half of the profit would go to him. The Commission advocates a two-year suspension.

While the respondent testified that he participated in the business transactions with the client only to help her, the evidence establishes his pecuniary gain as the dominant interest. The respondent admits he "wanted the investments to be successful because they would be beneficial to *both* (the client) and himself." *Respondent's Memorandum on Sanctions,* p. 4 (emphasis in original). The respondent also acknowledges he made only a thirty-three percent (33%) investment but was entitled to fifty percent (50%) of future profits in the businesses. *Id.*[2] He even took one-half (½) of the rent-to-own business losses as a deduction on his personal tax return. However, the respondent ar-

gues that his actions, "while irresponsible and misguided, were grounded in an altruistic and benevolent desire to help a financially unsophisticated friend and client, not out of some selfish and conniving evil intent." *Id.,* p. 8.

Also significant is the timing of the transactions. The respondent spent virtually all of the $200,000 within a six-week period. The investments were suggested and advocated by the respondent. He maintained all of the $200,000 funds in accounts over which he could independently exert control and for which he retained no detailed records. He invested the money in high risk ventures, knowing that his client's disability impaired her job prospects. His client had a 9th grade education and had experienced drug and alcohol problems.

Inconsistencies in the respondent's testimony also indicate his less than purely altruistic motives. He initially denied partnering with the client in the rent-to-own business, but the documentary evidence established that he was the incorporator and president of the business, that he had borrowed money in the name of the corporation, that he had written checks on the company account and even received 50 percent of the tax benefit from company losses in the two years the business was operated.

We find the evidence supports the conclusion that the respondent purposely took advantage of his unsophisticated client for his personal pecuniary benefit. Standard 4.12 of the model *American Bar Association Standards for Imposing Layer Sanctions* provides that suspension is appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client. We find the respon-

---

**2.** Given that the respondent paid many personal expenses from his share of the settlement and some of the client's personal expenses were paid from her share of the settlement, we are unclear whether the respondent actually invested 33 percent or whether a lesser figure is accurate. However, we need not decide that issue, as it is sufficient that the respondent admits he accepted a portion of the profits disproportionate to his monetary investment.

dent's selfish manipulation of his client warrants a significant period of suspension.

Accordingly, we order that the respondent be suspended from the practice of law for a period not fewer than 18 months, beginning February 12, 2001, without automatic reinstatement.

The Clerk of this Court is directed to provide notice of this order in accordance with Admis.Disc.R. 23(3)(d) and to provide the Clerk of the United States Court of Appeals for the Seventh Circuit, the Clerk of each of the United States District Courts in this state, and the Clerk of each of the United States Bankruptcy Courts in this state with the last known address of the respondent as reflected in the records of the Clerk.

Costs of this proceeding are assessed against the respondent.